# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DAVID GRAY, as personal
representative of the ESTATE OF
JULIAN DAVID GRAY-FLORANCE ;

Appellant,

v.

THE CITY OF SEATTLE, a municipal
corporation; SEATTLE PUBLIC
UTILITIES; RAY HOFFMAN, in his
official capacity as Director of Seattle
Public Utilities only; and DOES 1-50,

Respondents.

No. 77577-4-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: June 3, 2019

APPELWICK, C.J. — Gray-Florance died when the vehicle in which he was riding skidded sideways and struck a fire hydrant on his passenger side door. Gray, as personal representative of Gray-Florance's estate, sued the City, alleging that the hydrant's standpipe was negligently installed, failed to breakaway as designed, and caused Gray-Florance's death. The trial court granted summary judgment and dismissed the case. The Estate argues that the trial court erred in concluding that it failed to present a genuine dispute of material fact as to proximate cause. We affirm.

## FACTS

On New Year's Eve 2013, Julian Gray-Florance, his friend Arthur Sawe, and his girlfriend Kaycee Davis went to a bar in the Capitol Hill neighborhood of Seattle.

Sawe drove them to the bar in Gray-Florance's vehicle, and they stayed at the bar for approximately two and a half hours. After leaving the bar, they got into Gray-Florance's car and headed back to Sawe's house. Sawe was driving, Gray-Florance was in the front passenger seat, and Davis was in the right rear passenger seat.

While traveling northbound on Lakeview Boulevard East, the vehicle fishtailed several times before Sawe lost control of the vehicle and veered west. The vehicle then crossed the southbound lane of traffic and began a sideways slide onto the west sidewalk. After it began to slide, the vehicle struck a crosswalk sign before striking a fire hydrant on the passenger side, causing the vehicle to roll over. In Detective James Bulawa's inspection of the vehicle, he noted "contact damage to the passenger's door area . . . which continued into the interior of the vehicle approximately 36 inches." Witnesses estimated that the vehicle had been traveling between 35 to 50 miles per hour.

The Seattle Fire Department responded to the scene and declared Sawe and Gray-Florance deceased. Davis survived, suffering a fractured left leg, bruising on her head, and burn marks on her right side. Dr. Richard C. Harruff, the chief medical examiner at the King County Medical Examiner's Office, later concluded that Gray-Florance's cause of death was "blunt force injuries of the torso."

On June 15, 2016, David Gray, as personal representative of the estate of Gray-Florance (Estate), sued the City of Seattle (City), Seattle Public Utilities (SPU), SPU Director Ray Hoffman, the City and SPU's agents and employees,

and other individuals and entities he believed were at fault in the collision.[1] The

Estate's complaint included claims for wrongful death, negligence, and negligent

supervision. Specifically, the Estate alleged that

> [the fire hydrant] did not break away immediately upon impact as designed. The riser section of the pipe left the fire hydrant too far above grade for the safety flange and safety bolts to breakaway as intended when struck by plaintiff's vehicle. The height of the fire hydrant was not only negligently above grade, but it was also in violation of Seattle rules, codes, regulations, and/or ordinances as well as violating the manufacturer's recommendations and requirements.

The Estate further alleged that, "[a]s a proximate result of defendants'

negligence and at-fault acts or omissions, the vehicle's frame and/or rocker panel

hooked the fire hydrant flange, causing the vehicle to flip over, resulting in fatal

injuries to both the driver Arthur Sawe, and the front seat passenger, plaintiff Julian

Gray[-Florance]." And, it alleged that "[i]n the ten years prior to the incident,

defendants altered or directed the alteration of the height and placement of the

hydrant leaving the roadway unprotected, unsafe, and in a dangerous condition for

any and all users of the road."

The fire hydrant that Gray-Florance's vehicle struck is located in the

sidewalk west of Lakeview Boulevard East. The hydrant is 2 feet from the curb

and 10 feet from the lanes of travel. Its assembly includes a standpipe that extends

below grade and connects to the City's water main. Specifically, the standpipe

extends down through the concrete sidewalk, which functions as a "shear block"

---

[1] The defendants, who are all respondents on appeal, are represented by the Seattle City Attorney's Office. Therefore, we collectively refer to the respondents as "the City."

3

to prevent the standpipe from shifting if external forces act upon it or the curbstand. The curbstand is the visible, operational part of the assembly, commonly thought of as the fire hydrant. It is affixed to the top of the standpipe at the flange, using eight shear bolts. The flange, also referred to as the "shear plane," is slightly less than one inch thick.

During the collision, the vehicle struck the standpipe such that the flange was positioned above the vehicle's rocker panel. The rocker panel, a structural component of the vehicle that runs the length of the vehicle under the driver side door and passenger side door, ripped off the vehicle and wrapped around the standpipe. The passenger side door also made contact with the hydrant's curbstand, and folded in half.

In 2005, the City added a nine inch standpipe extension to the hydrant. The City's 2005 "Standard Specifications for Road, Bridge and Municipal Construction" (2005 Standard Specifications) required a hydrant's flange to be set two inches minimum and seven inches maximum above finished grade. The standard is designed to be below the average bumper height on a vehicle, so that if a vehicle hits it, it breaks the curbstand off but does not rip the standpipe out of the ground. The parties do not dispute that the 2005 Standard Specifications applied to the City's 2005 height adjustment. And, they do not dispute that the curbstand broke away from the standpipe during the collision.

One of the Estate's experts, Edward Stevens, a civil engineer, found that the underside of the hydrant's standpipe flange was 8.6 inches above the sidewalk on the side impacted in the collision. He also found that the top of the flange,

4

where the curbstand is designed to shear, was approximately 9.5 inches above the sidewalk. The City's expert, Nathan Rose, an accident reconstructionist, measured the height of the bottom of the flange against the slope of the sidewalk, and found that the bottom of the flange was between 7.8 and 8.6 inches above the sidewalk. The City does not dispute that, according to its measurements, the hydrant's flange was between 0.8 and 1.6 inches higher than specified in the 2005 Standard Specifications.

On June 12, 2017, the trial court granted the City partial summary judgment as to whether Sawe was under the influence of intoxicants at the time of the collision and negligent as a matter of law under RCW 5.40.050, and whether Gray-Florance was also under the influence of intoxicants. Specifically, the court found that there was a genuine dispute of material fact as to whether Sawe and Gray-Florance were under the influence of alcohol. But, it found that Sawe was driving under the influence of methylenedioxymethamphetamine (MDMA), and therefore negligent as a matter of law. The court also found that Gray-Florance was under the influence of MDMA as a matter of law.[2]

On August 4, 2017, the City moved for summary judgment dismissal of the Estate's negligence claims. It argued that the Estate lacked sufficient evidence to establish that (1) the hydrant's condition constituted a breach of the City's duty, and (2) the hydrant height proximately caused Gray-Florance's fatal injury. Specifically, the City argued that testimony by Stevens, one of the Estate's experts,

---

[2] The court declined to find that Gray-Florance was negligent as a matter of law. It stated that Gray-Florance's alleged negligence was a jury determination.

did not assist the jury and should be excluded under ER 702. And, it argued that the Estate's other experts, accident reconstructionist Charles Lewis and civil and structural engineer Joseph McClure, "rel[ied] on conjecture and unsupported conclusions." Thus, the City argued that Lewis and McClure's opinions were also inadmissible.

Even with the Estate's expert testimony, the City argued that the Estate could not establish that Gray-Florance would not have died but for the alleged breach. The City asserted that the Estate "urges City liability based on unsupported speculation that the accident might not have unfolded in precisely the manner it did had the [standpipe] been some unknown amount lower, but would nonetheless have occurred and still may have been fatal." It continued, stating that the "experts' rampant speculation would require the jury to impermissibly speculate and cannot form the basis for proximate cause."

At the hearing on the motion, the court did not exclude the opinions of the Estate's experts, nor address their admissibility under ER 702. The court stated that the Estate failed to present a genuine issue of material fact on proximate cause. The court framed the issue as follows:

> The duty in this case is related to proximate cause. Proximate cause comes from the duty. Duty from the plaintiff's point of view . . . is that the City shouldn't have had the top inch or inch and a half of this standpipe . . . above ground. And what I'm wondering, . . . what the jury is going to want to know, . . . did the City breach that duty, and then, if so, did that breach cause the injury. As put forth by defense, but for that breach . . . there are policy reasons behind it that may be a legal causation -- would there have been an injury? . . . [Is] there any proof of what would have happened? And there isn't.

6

The court continued, stating that the Estate had to present evidence to create a genuine issue of material fact as to what likely would have happened if the standpipe was an inch and a half lower:

> [The Estate had] to show through some expert testimony that it is more likely than not that the death of Mr. Gray-Florance wouldn't have happened, and I don't have that evidence in front of me. I have the deposition testimony of Plaintiff's experts that say they don't know what would have happened, and that is not enough to get this case to the jury.

The trial court granted the City's motion and dismissed the case. The Estate then filed a motion for reconsideration that the trial court denied.

The Estate appeals.[3]

## DISCUSSION

The Estate makes three arguments. First, it argues that a reasonable juror could conclude that the fire hydrant was a proximate cause of Gray-Florance's death.[4] Second, it argues that the trial court improperly considered Gray-Florance's purported intoxication. Third, it argues that the trial court improperly considered Sawe's purported intoxication in holding that he was negligent per se.

---

[3] Specifically, the Estate appeals (1) the June 13, 2017 order denying in part and granting in part the City's motion for partial summary judgment, (2) the September 1, 2017 order granting the City's motion for summary judgment, and (3) the October 6, 2017 order denying the Estate's motion for reconsideration.

[4] In doing so, the Estate argues that the trial court (1) improperly weighed evidence, (2) misapplied the "but for" analysis of proximate cause, and (3) improperly shifted the burden of proof to the Estate by requiring it to prove Gray-Florance would have survived if the fire hydrant had been installed in a proper and safe manner.

I. Standard of Review

This court reviews summary judgment orders de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Peterson v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). The moving party bears the initial burden of showing that no issue of material fact exists. Young v. Key Pharms., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

"A defendant may move for summary judgment by showing that there is an absence of evidence to support the plaintiff's case." Sligar v. Odell, 156 Wn. App. 720, 725, 233 P.3d 914 (2010). If the defendant meets this initial showing, the inquiry then shifts to the plaintiff. Young, 112 Wn.2d at 225. If the plaintiff "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' then the trial court should grant the motion." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). When considering the evidence, the court draws reasonable inferences in the light most favorable to the nonmoving party. Schaaf v. Highfield, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

II. Negligence

"[M]unicipalities are generally held to the same negligence standards as private parties." Keller v. City of Spokane, 146 Wn.2d 237, 242-43, 44 P.3d 845 (2002). Thus, to prevail on its negligence claims, the Estate "must prove duty,

breach, causation, and injury." Cho v. City of Seattle, 185 Wn. App. 10, 16, 341 P.3d 309 (2014).

"A proximate cause is one that in natural and continuous sequence, unbroken by an independent cause, produces the injury complained of and without which the ultimate injury would not have occurred." Attwood v. Albertson's Food Ctrs., Inc., 92 Wn. App. 326, 330, 966 P.2d 351 (1998). Washington recognizes two elements to proximate cause: cause in fact and legal causation. Hartley v. State, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury." Id. at 778. Legal causation "is grounded in policy determinations as to how far the consequences of a defendant's acts should extend." Crowe v. Gaston, 134 Wn.2d 509, 518, 951 P.2d 1118 (1998).

III. Expert Testimony

As an initial matter, the City argues that the Estate's expert testimony is inadmissible under ER 702.[5] Specifically, it argues that Lewis and McClure lack

---

[5] The City also argues that the expert testimony is inadmissible under Frye v. United States, 293 F. 1013 (D.C. Cir. 1993). "While Frye governs the admissibility of novel scientific testimony, the application of accepted techniques to reach novel conclusions does not raise Frye concerns." Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 919, 296 P.3d 860 (2013). Here, the City argues that the Estate's expert testimony "amount[ed] to inadmissible speculation," that the experts' opinions "are grounded in flawed methodology," that Lewis and McClure "lack the foundation to render an opinion regarding survivability," and that Stevens's opinion about the roadway "is conclusory and lacks foundation." Because the City does not argue that the Estate's experts relied on novel techniques, Frye does not apply. Also, the City failed to raise its Frye argument to the trial court. Accordingly, we do not address the argument. See RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court.").

the foundation to render an opinion regarding survivability. The City also argues that Stevens's opinion about the roadway being inherently dangerous is conclusory and lacks foundation.

In its summary judgment motion, the City asked the trial court to exclude the opinions of Lewis, McClure, and Stevens under ER 702. The court did not exclude any expert testimony in granting summary judgment in favor of the City.

Expert testimony is admissible when (1) the witness qualifies as an expert, (2) the opinion is based upon an explanatory theory generally recognized in the scientific community, and (3) if it will be helpful to the trier of fact. ER 702; In re Pers. Restraint of Morris, 176 Wn.2d 157, 168-69, 288 P.3d 1140 (2012). Expert testimony is helpful if it concerns matters beyond the average layperson's common knowledge and is not misleading. State v. Groth, 163 Wn. App. 548, 564, 261 P.3d 183 (2011). An expert must rely on facts and data, not mere speculation. See Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha, 126 Wn.2d 50, 102-04, 882 P.2d 703, 891 P.2d 718 (1994). When formulating opinions, "[o]ne expert may rely on the opinions of another expert." Driggs v. Howlett, 193 Wn. App. 875, 900, 371 P.3d 61 (2016). But, conclusory opinions lacking adequate foundation will be excluded. Miller v. Likins, 109 Wn. App. 140, 148, 34 P.3d 835 (2001).

A. McClure

McClure is a civil and structural engineer. His analysis relates to the mechanical interaction between the passenger side of the vehicle, including the door and rocker panel, and the fire hydrant assembly. McClure conducted independent research into mechanics, the types of bolts used in a fire hydrant

10

breakaway connection, fire hydrant design, and the design of the vehicle involved. He also relied on reports and information from other experts in the case.

In his declaration, McClure concluded that, if the shear plane had been set closer to grade level, "the rocker panel would have imparted greater force onto the curbstand and caused it to shear at an earlier point in time in the accident sequence." He stated that this would have "caus[ed] less intrusion into the passenger compartment of the vehicle."

Specifically, McClure concluded that, if the shear plane had been set more than 1.6 inches lower and the rocker panel had partially struck the standpipe, "the vehicle would have glanced over the standpipe or the stand pipe would have torn through the gauge metal of the bottom part of the rocker panel." Either way, he stated that there would have been less intrusion by the curbstand, the vehicle would not have hooked and rolled over from the impact with the standpipe, and "[t]he progress of the accident would have been substantially different."[6]

McClure ultimately concluded that, "[g]iven the mechanics of the subject collision, the damage to the vehicle would have decreased as the height of the fire hydrant assembly's shear plane was lowered." He also stated that, had the standpipe been lowered three inches or more, the curbstand would have sheared with approximately 12 or less inches of intrusion, the rocker panel would have cleared the standpipe, and the vehicle would not have rolled.

---

[6] At oral argument, the Estate argued that the impact of the vehicle hitting the hydrant, not the vehicle flipping over, caused Gray-Florance's death.

At McClure's deposition, he was asked how the accident would change with the standpipe down at seven inches. McClure responded,

> Well, among other things, you have a much stronger portion of the car hitting the curbstand. So it increases -- it's going to decrease the penetration into the car because you've got a stronger element there, and it's going to break the curbstand free sooner. And I can't go beyond that, but I can tell you that it will be a different accident.

He was then asked, "Can you say anything about the difference in injuries to the plaintiff?" McClure responded, "No."

Later, McClure was asked again about how the accident would have been different with a seven inch standpipe. McClure responded,

> So [the curbstand's] going to break away sooner, but I can't tell you -- I can't tell you any of the things about what happens after the accident. I can't tell you about the survivability, who lives, who dies, I can't tell you any of that, and I can't tell you whether or not the car would roll over.

He was also asked specifically about Gray-Florance's physical injuries:

> Q. And we've already talked about you don't have an opinion about the physical injury to the plaintiff being different under any scenario?
>
> A. Right, not my field of expertise.
>
> Q. You just don't know?
>
> A. I just don't know.

McClure testified that he could not say anything about survivability. He also testified that the difference in physical injury to Gray-Florance was not his field of expertise. McClure did not opine as to what the difference in physical injury would have been with a lower standpipe.

We do not find his conclusions inadmissible under ER 702.

B. Lewis

Lewis is an accident reconstructionist. To formulate his opinions, he "recreated the collision dynamics under multiple factual scenarios using a computer modeling program." He stated that this is typical for accident reconstructionists' work. He produced four videos, one with the hydrant, one with the standpipe alone at the height it was at the time of the accident, one with the standpipe alone, lowered by 1.6 inches, and one with the standpipe alone, two inches above ground. Lewis also relied on reports and information from other experts in the case.

In his declaration, Lewis concluded that "the damage to the vehicle would have decreased as the height of the fire hydrant assembly's shear plane was lower."[7] He stated that generally, as the damage to a vehicle is decreased, the damage to occupants is decreased, particularly with side impact collisions. The remainder of his conclusions are based on the "shear plane" being set "two to three inches closer to the sidewalk." He stated that, with the shear plane two to three inches closer,

> [T]he majority of [the] vehicle's rocker panel would have contacted [the] curbstand rather than the immovable standpipe. Because the rocker panel is structural to the vehicle, the rocker panel would have imparted greater force onto the curbstand and caused it to shear at an earlier point in time in the accident sequence.

---

[7] Lewis calls the "top of the standpipe flange," which was nine to nine and a half inches above the sidewalk, the "shear plane." The "underside of the standpipe flange," which he states was the "known point of impact," was 8.6 inches above the sidewalk.

More specifically, Lewis concluded that if the shear plane had been set closer to grade level and the rocker panel struck the curbstand above the shear plane, "the curbstand would have intruded into the passenger compartment of the vehicle" approximately 12 inches, instead of 36 inches. He also stated that, if the shear plane had been set two to three inches lower and the vehicle still contacted the standpipe, the vehicle would have "glanced over the standpipe." As a result, "there would have been significantly less vehicle deformation and significantly less intrusion into the passenger compartment of the vehicle." And, "the deceleration of the vehicle would have been approximately two miles per hour."[8]

Ultimately, Lewis concluded that "there would have [been a] significant reduction of force and physical trauma acting upon the occupants of the vehicle." He did not quantify what the reduction in force and physical trauma would have been.

At Lewis's deposition, he was asked about his statement that, had the shear plane been set closer to grade level and the rocker panel had struck the curbstand above the shear plane, the curbstand would have intruded into the vehicle's

---

[8] The Estate notes that the City's expert agreed with Lewis on this point. According to the City's and Estate's experts, the vehicle was traveling between approximately 45 to 49 miles per hour when it struck the hydrant. It is worth noting that, had it decelerated by 2 miles per hour after suffering a 12 inch intrusion into the passenger compartment, the vehicle would have continued moving sideways at a speed of 43 to 47 miles per hour. Beyond the sidewalk where the hydrant is located, the ground begins to slope steeply away from the road. Specifically, about 40 feet from the hydrant is an embankment. When asked if he had an opinion on what would have happened if the vehicle went over the embankment, Lewis stated, "It would hit the trees." But, he also stated that he had not done any work to determine what would have happened if the vehicle went over the embankment. Later, when asked what the effect of the vehicle going down the embankment at 45 miles per hour or greater would have been, he responded, "I don't know."

passenger compartment approximately 12 inches. Lewis responded, "I think that's an opinion I got from Mr. McClure." The following exchange then occurred:

Q. So you don't have an opinion about how far the hydrant would have intruded into the vehicle if the shear plane had been lower?

A. No.

Q. And so does that mean you also do not have an opinion about whether the accident would have been fatal, even if the shear plane had been lowered?

A. No. My opinion is had the fire hydrant broken away shortly after contact, it would not have penetrated as far into the Mustang as it did.

Q. Do you know how much penetration of the curbstand into the Mustang would be required to produce a fatality?

A. I don't.

Lewis was also asked, "Fair to say you're not an expert on what physical injuries Mr. Gray would have suffered if the hydrant shear plane had been lower at the time of the accident?" Lewis responded, "I am not an expert on that." Later, Lewis testified about what types of experts could opine as to a difference in physical injuries:

Q. What types of experts usually deal with calculating the different types of injuries the human body would have sustained if physical things about the scene had been different?

A. Biomechanical engineer.

Q. Have you talked to any biomechanical engineers regarding this accident?

A. Not regarding this case, no.

Q. Are you aware of any working on this case?

A. No, I do not.

15

Q. But that's who I would want to talk to, right, if I wanted to figure out what difference there would have been in terms of physical injuries to Mr. Gray if the hydrant had been lower; right?

A. Yes.

Q. So you're not in a good position to answer that line of questions; right?

A. Correct.

Lewis agreed that he was not in a good position to answer questions regarding the difference in Gray-Florance's injuries with a lower hydrant. He stated that a biomechanical engineer usually calculates the different types of injuries a person would sustain if physical things about the scene had been different, and that he had not talked to any biomechanical engineers.

We do not find his conclusions inadmissible under ER 702.

C. Stevens

Stevens is a civil engineer. His opinions are related to the design and installation of public roadways, and structures and utilities adjacent to public roadways. To formulate his opinions, he conducted independent research into roadway design and standards, and fire hydrant design and standards. He also reviewed and relied upon reports and information from other experts in the case.

In his declaration, Stevens concluded that "[t]he as-built condition of the subject fire hydrant assembly is inherently dangerous." He stated that "[t]he as-built condition . . . will result in greater damage to the vehicle, and it will result in greater risk of injury to passengers in the vehicles when a collision with a fire hydrant assembly foreseeably occurs." And, he stated that the City has a duty "to make sure its fire hydrant assemblies adjacent to roadways do not present

additional danger to persons and property if a vehicle leaves the roadway and strikes a fire hydrant assembly."

At Stevens's deposition, he was asked about his opinion that the fire hydrant assembly is inherently dangerous. Stevens stated,

> It's a fact that, Number 1, it was substandard, and my conversations with Mr. Lewis indicated that that substandard nature allowed further -- I can't remember all the words that he used and some of it I didn't really understand -- but it was impalement I guess you'd say into the vehicle.

Stevens then stated that he did not offer, nor intend to offer, any opinion about what happened in the accident, mechanically or physically. He said that would be up to Lewis or McClure.

Stevens's opinion that the hydrant assembly is inherently dangerous, and will result in greater damage to the vehicle and greater risk of injury to the passengers, relies on Lewis's conclusions. When asked if he had independent knowledge to support his opinion that the hydrant's "as-built condition" "will result in greater damage to the vehicle, et cetera," Stevens responded, "That would be out of my field." Stevens did not opine as to whether there would have been a reduction in physical trauma to Gray-Florance with a lower standpipe. He stated that he did not offer, nor intend to offer, any opinion about what happened in the accident, mechanically or physically.

We do not find his conclusions inadmissible under ER 702.

IV.    Cause in Fact

The Estate argues that the trial court either ignored or weighed the credibility of the experts in the case, neither of which was appropriate in granting

the City's motion for summary judgment. It also argues that the court misapplied the "but for" causation analysis, shifting the burden to the Estate to prove that Gray-Florance, "more likely than not, would have survived the collision if the fire hydrant assembly was placed one and a half inches lower." The Estate relies primarily on Mehlert v. Baseball of Seattle, Inc., 1 Wn. App. 2d 115, 404 P.3d 97 (2017).

Cause in fact refers to "but for" causation, events the act produced in a direct unbroken sequence, without which the injury would not have occurred. Kim v. Budget Rent A Car Sys., Inc., 143 Wn.2d 190, 203, 15 P.3d 1283 (2001). "[T]o hold a governmental body liable for an accident based upon its failure to provide a safe roadway, the plaintiff must establish more than that the government's breach of duty might have caused the injury." Miller, 109 Wn. App. at 145.

Causation is usually a jury question. Mehlert, 1 Wn. App. 2d at 119. However, it becomes a question of law for the court "when the causal connection is so speculative and indirect that reasonable minds could not differ." Id.

In Mehlert, the plaintiff fell while leaving a store and landed at the bottom of a set of stairs, injuring herself. Id. at 116-17. A ramp had been placed over the stairs to make the store accessible by wheelchair, but there were no required handrails adjacent to the ramp or the stairs. Id. at 116. This court held that a genuine issue of fact existed regarding whether the absence of required handrails was the proximate cause of Mehlert's injuries. Id. We based our holding on expert testimony by a human factors specialist that appropriate handrails would have lessened or prevented Mehlert's injuries, and Mehlert's testimony. Id. at 120-21.

18

Mehlert testified that she remembered wanting to reach for something because she was falling. Id. at 119. Harley, Mehlert's human factors specialist, opined that the absence of handrails presented a safety hazard and was a contributing factor in Mehlert's fall. Id. at 120. In doing so, Harley presented research about the effectiveness of handrails in preventing falls. Id. She also discussed studies "showing that in moments of destabilization, individuals are almost always able to reach out and successfully grab a handrail." Id. Harley concluded that, had appropriate handrails been present, Mehlert would have been able to reach out to grasp one, thereby lessening or preventing her injuries. Id.

Like Mehlert, this case presents a safety hazard. The height of the hydrant's standpipe flange did not comply with the 2005 Standard Specifications. The flange was 8.6 inches above grade, 1.6 inches higher than the 7 inch maximum. But here, a compliant hydrant would not have prevented the collision itself. Sawe had lost control of the vehicle, and, according to the City and Estate's experts, the vehicle was traveling between approximately 45 to 49 miles per hour when it struck the hydrant. The question here is whether Gray-Florance would have survived had the standpipe been 1.6 inches lower.

Based on Lewis and McClure's opinions, without the extra 1.6 inches of standpipe, the intrusion into the vehicle would have been 12 inches instead of 36 inches. But, the Estate does not have an expert who can opine that Gray-Florance would not have sustained fatal injuries. Without this evidence, a reasonable juror could only speculate as to what Gray-Florance's injuries would have been if the hydrant's flange had been at the proper height. Unlike Mehlert, the Estate's

19

experts either did not or are not competent to opine that a compliant hydrant would have lessened or prevented Gray-Florance's injuries.

The Estate failed to raise a genuine dispute of material fact regarding cause in fact. This is a necessary element of negligence. Cho, 185 Wn. App. at 16. Summary judgment is proper if the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Young, 112 Wn.2d at 225 (quoting Celotex, 477 U.S. at 322). Accordingly, the trial court did not err in granting summary judgment in favor of the City.[9]

V.    Gray-Florance's Negligence

The Estate argues next that the trial court improperly considered Gray-Florance's intoxication. It argues that RCW 5.40.060(2) bars the City's affirmative defense alleging that Gray-Florance's intoxication played any role in the collision.[10]

The court found that, as a matter of law, Gray-Florance was under the influence of MDMA. RCW 5.40.060(2) provides,

> In an action for damages for personal injury or wrongful death that is brought against the driver of a motor vehicle who was under the

---

[9] The City also argues that summary judgment is warranted on the alternate ground that the Estate cannot establish that the City breached a duty. In granting the City summary judgment, the trial court did not reach the question of whether the City's failure to comply with the 2005 Standard Specifications was a breach of its duty to maintain roadways in a condition reasonably safe for ordinary travel. Keller, 146 Wn.2d at 249. However, because we conclude that the Estate failed to present a genuine dispute of material fact as to causation, we do not reach the question of duty.

[10] The Estate does not argue that the trial court considered Gray-Florance's intoxication in deciding the City's August 4, 2017 summary judgment motion on duty and causation. Thus, we construe the Estate's argument as challenging the court's June 12, 2017 order granting partial summary judgment to the City.

influence of intoxicating liquor or any drug at the time of the occurrence causing the injury or death and whose condition was a proximate cause of the injury or death, subsection (1) of this section does not create a defense against the action notwithstanding that the person injured or killed was also under the influence so long as such person's condition was not a proximate cause of the occurrence causing the injury or death.

RCW 5.40.060(2) applies to "an action for damages for personal injury or wrongful death that is brought against the driver of a motor vehicle who was under the influence of intoxicating liquor or any drug at the time of the occurrence." Because the statute applies to actions against the driver of a motor vehicle, it does not apply to the Estate's suit against the City. See RCW 5.40.060(2).

Also, in granting the City partial summary judgment, the court did not actually consider Gray-Florance's intoxication or determine whether he was negligent. Instead, it found that Gray-Florance's alleged negligence regarding whether he knew Sawe was intoxicated or impaired was a jury determination. Thus, the trial court did not err.

## VI.  Sawe's Negligence

The Estate argues that the trial court improperly considered Sawe's purported intoxication in holding that he was negligent per se. It asserts that, under RCW 5.40.060, the City had to prove its intoxication affirmative defense using the same standard established for criminal convictions under RCW 46.61.502, which it did not do.

The Estate relies on RCW 46.61.502(1)(a). Under that statute, a person is guilty of driving while under the influence of intoxicating liquor, marijuana, or any drug if the person drives a vehicle within this state "[a]nd the person has, within

21

two hours after driving, an alcohol concentration of 0.08 or higher as shown by analysis of the person's breath or blood made under RCW 46.61.506." RCW 4.61.602(1)(a).

The Estate also cites State v. Brown, 145 Wn. App. 62, 184 P.3d 1284 (2008). Under Brown, to admit blood alcohol test results, the state must present prima facie proof that the test chemicals and the blood sample are free from any adulteration which could introduce error to the test results. 145 Wn. App. at 69-70.

The Estate's argument focuses on the City "not properly prov[ing] the blood alcohol levels using the criminal burden of proof." The authorities it cites address blood alcohol test results. But, the trial court did not hold that Sawe was negligent per se based on his blood alcohol level. Rather, it found that there was a genuine dispute of material fact as to whether Sawe was under the influence of alcohol. The court found that Sawe was driving under the influence of MDMA, and therefore negligent as a matter of law under RCW 5.40.050. The authorities the Estate relies on do not address test results for other drugs. Accordingly, the trial court did not err.

We affirm.

Appelwick, C.J.

WE CONCUR:

Mann, A.C.J.

Schindler, J.